Filed 3/26/24  Pioneer Union Elementary School Dist. v. State Allocation Bd. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PIONEER UNION ELEMENTARY SCHOOL DISTRICT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STATE ALLOCATION BOARD et al., <br><br> Defendants and Respondents. | F086018 <br><br> (Super. Ct. No. 22C-0055) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Melissa R. D'Morias, Judge.

Tao Rossini and Martin A. Hom for Plaintiff and Appellant.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, Mark R. Beckington and Kevin J. Kelly, Deputy Attorneys General, for Defendant and Respondents.

-ooOoo-

The State Allocation Board (Board) is responsible for determining school districts' eligibility to receive state bond funding for the construction of new school facilities, as well as the funding amount a school district may receive.  From May 2012 through

November 2016, California's bond fund was exhausted. To address the situation, the Board adopted a regulation directing the Office of Public School Construction (the Office or OPSC), which provides executive and administrative support to the Board, to continue to accept and verify school district funding applications for completeness and place them on a list without further action. After the voters restored the bond funding in November 2016, the Board directed school districts with new construction funding applications on the list to resubmit updated enrollment projections to reflect changes in student populations when their applications eventually were processed.

Pioneer Elementary School District (Pioneer) submitted an enrollment projection and funding application during the unfunded period, but in accordance with the regulation, they were not presented to the Board for approval. After bond funding was restored and the Office began processing Pioneer's application, Pioneer was asked to submit updated information, which showed its projected enrollment had decreased significantly, thereby reducing its eligibility for funding.

Pioneer filed a petition for writ of mandate against the Board and the Office, asserting they had a duty to use the enrollment projection Pioneer submitted during the unfunded period when processing its funding application. The trial court denied the writ. On appeal, Pioneer contends the Board's resubmission requirement was contrary to law and constituted an underground regulation. Finding no merit to Pioneer's arguments, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*Background*

We begin by reviewing the process for state funding of school construction, which is set forth in the Education Code and implementing regulations. The Leroy F. Green School Facilities Act of 1998 (Sen. Bill No. 50 (1997-1998 Reg. Sess.); Stats. 1998,

2.

ch. 407, § 4) (Ed. Code, § 17070.10 et seq.)[1] (the Act), "governs the allocation of state funds for school facilities construction." (*California Charter Schools Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1230.) The Act established the State School Facilities Fund (the State Fund), from which funds are apportioned to school districts to pay for construction projects. (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 473; § 17070.40. subd. (a)(1).)

Money is deposited into the State Fund through the issuance of state bonds as approved by the voters. (See, e.g., *Godinez v. Schwarzenegger* (2005) 132 Cal.App.4th 73, 78.) Initially, the State Fund was funded by Proposition 1A, the Class Size Reduction Kindergarten-University Public Education Facilities Bond Act of 1998 (Prop. 1A), which authorized a $9.2 billion bond issue for education facilities—$6.7 billion for K-12 and $2.5 billion for higher education. (*Godinez*, at p. 78; §§ 100403, 100410, subd. (a), 100415, 100425, 100500.) Proposition 1A's purpose "was to provide funding for education facilities for class size reduction, to relieve overcrowding and accommodate enrollment growth, and to repair older schools and for wiring and cabling for education technology." (*Godinez*, at p. 78.)

Since the Act was adopted in 1998, California voters have approved bond measures for K-12 school funding multiple times: (1) in November 2002, Proposition 47, provided $11.4 billion; (2) in March 2004, Proposition 55 added $10 billion; and (3) in November 2006, Proposition 1D, added $7.329 billion. (§§ 17070.40, subds. (b)(1), (c)(1), (d)(1), 100600, 100610, 100620, subd. (a), 100800, 100803, 101000, 101010, 101011, 101012; Cal. Code Regs., tit. 2, § 1859.2.[2])

---

[1]    Undesignated statutory references are to the Education Code.

[2]    Subsequent references to Title 2 of the California Code of Regulations shall be cited in the text as "Regulation" followed by the section number in the text, and in citations as "2 C.C.R.," followed by the section number.

The Act funds new construction and modernization projects, which are denominated the School Facility Program or SFP (the Program). (2 C.C.R., §§ 1859.2, 1859.20.) School districts apply for funds for new construction and modernization, which are provided in the form of per-pupil grants, with supplemental grants available when the applying school district is eligible for them. (§§ 17072.10, 17074.10.)[3] For new construction projects, the school district generally is required to match the state's contribution from local sources. (§§ 17072.30, 17072.32; 2 C.C.R., § 1859.77.1.)

The Board oversees this process along with the Office, which assists the Board and administers the Act on behalf of the General Services Director. (§§ 17070.20, 17070.30; Gov. Code, §§ 14620, 15490-15492; 2 C.C.R., §§ 1859.1, 1859.2.) To facilitate its role, the Board promulgates regulations pursuant to authority granted under the Act and is empowered to establish procedures and policies in connection with administering the Act. (§ 17070.35, subd. (a)(1) & (2); 2 C.C.R., §§ 1859-1859.199.)[4] The Board determines each school district's eligibility to receive bond funds and apportions the available funds between eligible districts. (§§ 17070.35, subd. (a)(3) & (4), 17070.40; *Sanchez v. State of California*, *supra*, 179 Cal.App.4th at p. 473.) Funds are apportioned by being reserved "for the purpose of eligible new construction, modernization, or hardship approved by the board for an applicant school district." (§ 17070.15, subd. (a).)

---

[3] For example, in 1998, maximum grants ranged from $5,200 to $7,200 per pupil for new construction. (§ 17072.10, subd. (a).) Under the Act, the Board must account for inflation using the statewide cost index for class B construction, also known as the construction cost index. (§§ 17072.10, subd. (b), 17074.10, subd. (b); 2 C.C.R., §§ 1859.2, 1859.71.)

[4] The Board consists of 10 members—six members of the Legislature, the Superintendent of Public Instruction, a governor-appointed member, and the Directors of Finance and General Services. (§ 17070.30; Gov. Code, § 15490, subd. (a).)

There is a two-step process to receive new construction funding under the Act—an application for eligibility and an application for funding. To establish new construction eligibility a school district must: (1) submit a one-time inventory of existing school building capacity using Form SAB 50-02 (§ 17071.10; 2 C.C.R., § 1859.30); (2) determine projected enrollment five or 10 years into the future using Form SAB 50-01 (§ 17071.75, subd. (a)(2) & (3)(A)); 2 C.C.R., § 1859.40); and (3) calculate the district's baseline eligibility for new construction grants by subtracting the number of pupils that may be housed in the existing building capacity from the enrollment projection, with the difference representing "unhoused" pupils, using Form SAB 50-03 (§ 17071.75, subds. (c) & (d); 2 C.C.R., § 1859.50). "For a school district with an enrollment of 2,500 or less, an adjustment in enrollment projections shall not result in a loss of ongoing eligibility to that school district for a period of three years from the date of the approval of eligibility by the board." (§ 17071.75, subd. (g).)

If the Board determines a school district meets eligibility requirements for new construction funding, the school district may apply for a project apportionment of all or part of the funding the school district is eligible for using Form SAB 50-04. (§ 17072.20, subd. (a); 2. C.C.R. § 1859.70, subd. (a).) The calculated eligibility on Form SAB 50-03 is referred to as the "baseline eligibility for future [Program] funding," and is the basis for filing Form SAB 50-04. (2 C.C.R., § 1859.50.) In its funding application, the district must include its determination of the amount of state funding it is otherwise eligible for relating to site acquisition, site development, new construction, and hardship funding, if any. (§ 17072.20, subd. (b).) "The board shall verify and adjust, as necessary, and approve the district's application." (§ 17072.20, subd. (c).) Regulation 1859.51 lists the adjustments that "will be" made to the baseline eligibility determined on Form SAB 50-03. (2 C.C.R., § 1859.51.)

Because funding under the Act is based on voter-approved bond measures, the State Fund often falls short of the amounts that school districts request. For "Approved

5.

Applications"[5] submitted before November 2012, Regulation 1859.95 provides that when the Board has no funds to apportion, the Board "will continue to accept and process applications for eligibility determination" and "also accept and process applications for apportionment for purposes of developing an Unfunded List based on the date the application is Ready for Apportionment." (2 C.C.R., §§ 1859.2, 1859.95, 1859.95.1.) Regulation 1859.95 further provides that except for financial hardship eligibility, a school district with an application on the Unfunded List is not required to re-establish eligibility for that application before apportionment. (2 C.C.R., § 1859.95.)

In September 2012, the Board approved regulatory amendments to establish Regulation 1859.95.1, which, effective November 2012, replaced the Unfunded List with a list called the Applications Received Beyond Bond Authority List (the Applications Received List). (2 C.C.R., § 1859.95.1.)[6] The change resulted from the Board's desire to stop processing applications when there was no bond authority and to maintain the options for future changes to the Program, yet still allow school districts to submit projects.

Regulation 1859.95.1, subdivision (a)(1) provides that "[w]hen the Board has Insufficient Bond Authority to apportion the School District's funding request on the Form SAB 50-04" the Office "will receive and determine if the Form SAB 50-04 is an

---

[5]     " 'Approved Application(s)' means a district has submitted the application and all documents to the [OPSC] that are required to be submitted with the application as identified in the General Information Section of Forms SAB 50-01 [Enrollment Certification/Projection]; SAB 50-02 [Existing School Building Capacity]; SAB 50-03 [Eligibility Determination]; and SAB 50-04 [Application for Funding], as specified in Section 1859.2." (2 C.C.R., § 1859.2.)

[6]     Regulation 1859.2 defines the Applications Received List as "an informational list of applications submitted to the [OPSC] and presented to the Board. Funding applications placed on this list contain the preliminary grant amounts requested by a district. The OPSC has not determined that the Approved Application(s) are Ready for Apportionment."

Approved Application."[7] To be placed on the Applications Received List, a school board resolution must accompany an approved application. In that resolution, the school board must acknowledge, among other things: (1) the remaining Program bond authority is exhausted for the funds being requested; (2) the state is not expected or obligated to provide funding for the project and acceptance of the application does not guarantee future funding; (3) future state bond measures for the Program may not provide funds for the application; (4) the criteria (including funding, qualifications, and eligibility) under a future state school facilities program may differ from the current school facility program; and (5) the state is not responsible for any pre-construction or construction activities. (2 C.C.R., § 1859.95.1, subds. (a) & (b).) Regulation 1859.95.1 specifically provides that the Office "will continue to receive and determine if the Forms SAB 50-01, 50-02, and 50-03 are Approved Applications," but it "will not determine if the Approved Application is Ready for Apportionment." (2 C.C.R., § 1859.95.1, subd. (c).)[8]

### Pioneer's 2014 Eligibility Application and 2016 New Construction Application

Pioneer is a public school district organized and existing under the Education Code. Pioneer serves approximately 1,500 pupils at two elementary schools and one middle school in Hanford. One of the elementary schools, Pioneer Elementary School, housed over 70 percent of its students in portable classrooms that were placed there in 1991. Pioneer qualifies as a "Small School District" under the Act, as its average daily attendance is less than 2,500 pupils. (2 C.C.R., § 1859.2; § 17071.75, subd. (g).)

Pioneer established districtwide new construction eligibility in May 1999, which it updated for the 2007/2008 enrollment year. In October 2014, Pioneer submitted a

---

[7]     " 'Insufficient Bond Authority' means the total funding requested on the Approved Application received by the OPSC exceeds the Bond Authority." (2 C.C.R., § 1859.2.)

[8]     " 'Ready for Apportionment' means a final review of an Approved Application has been completed by the OPSC and it has been determined that it meets all requirements of law for an apportionment or eligibility determination, and the OPSC will recommend approval to the Board." (2 C.C.R., § 1859.2.)

districtwide new construction eligibility on Form SAB 50-01 based on the 2013/2014 enrollment year. Using the 10-year enrollment projection, Pioneer calculated its student population would total 2,189 students, comprised of 1,717 K-6 students and 472 7-8 grade students. Because bond funding was not available, the Office did not process Pioneer's eligibility update and the Board did not review or act on it.

In October 2016, Pioneer submitted its application, Form SAB 50-04, to the Office for both modernization and new construction projects to replace and construct 24 classrooms at Pioneer Elementary School. Pioneer sought $4.2 million in new construction funding to construct 11 permanent classrooms and one non-severe special day classroom, which included money for site development. Pioneer sought 260 per pupil grants comprised of 200 K-6 pupil grants, 49 7-8 pupil grants, and 11 special day class non-severe pupil grants, which were based on the 2013/2014 enrollment projections. Due to errors in the submission, Pioneer re-submitted its Form SAB 50-01 based on the 2013/2014 school year data, which resulted in 256 student grants.

In accordance with Regulation 1859.95.1, Pioneer submitted a school board resolution with the application, which acknowledged the program's limitations, including that funding criteria under a future state school facilities program may be "substantially different" than the current program, and that the school board was "electing to commence any pre-construction or construction activities at the district's discretion" and the state was not responsible for "any pre-construction or construction activities."

Since the new construction bond authority was exhausted, Pioneer's application was not processed, and it was placed on the Applications Received List as provided in Regulation 1859.95.1.

In June 2017, while Pioneer's application was pending with the Office, Pioneer proceeded with the new construction and modernization projects, which were completed in September 2019. Pioneer financed the projects through a local bond measure, which the voters approved in November 2016, general funds, and certificates of participation.

Pioneer intended to use state funds it received from the Program to repay the debt service on the certificates of participation.

### *The Restoration of Program Funding and the Board's Policy Decision*

In November 2016, voters approved the Kindergarten Through Community College Public Education Facilities Bond Act of 2016 (the 2016 bond act), which authorized the issuance and sale of $9 billion in bonds, with the proceeds deposited into the School Fund. (§§ 17070.41, 101110, 101112, 101120.) Three billion of the bond proceeds were allocated for new construction of school facilities of applicant school districts. (§ 101122.) In establishing the School Fund for the bond proceeds, the 2016 bond act permitted the Board to "apportion funds to school districts for the purposes of [the Act], as it read on January 1, 2015, from funds transferred to the 2016 State School Facilities Fund from any source." (§ 17070.41.)

With funding again available, the Office sought direction from the Board on how to proceed with processing the 280 new construction and 439 modernization projects that were pending on the Applications Received List as of March 2017, as well as approved applications that were received after that date but not added to the list. In a report to the Board for its June 5, 2017 meeting, the Office highlighted key items for the Board to consider in deciding this issue. The Office explained that when there was an Unfunded List, projects were funded in date order once new bond proceeds became available. The circumstances were different with the Applications Received List, however, as the timeframe between the exhaustion of bond authority and new bond funding was considerably longer than prior exhaustion periods.

The Office surmised that given the uncertainty surrounding the Program's future, including whether there would be a future bond or if there would be changes in the Program, some districts withheld applications until more was known about the Program's future. If applications on the Applications Received List were processed in the order received, districts that waited to submit applications would be disadvantaged.

9.

The Office noted the eligibility information was not current for school districts that submitted an eligibility establishment or update to accompany their funding application before November 2016. The Office explained that since new construction eligibility is based on enrollment projections, which "are used primarily because of the length of time it takes to build a school, so that it can be built in anticipation of projected enrollment growth," the Program regulations require all new construction projects to be justified by a current enrollment projection in the same enrollment reporting year in which the application for funding is made. In "justifying project eligibility in later years, some districts may show a decline in their projection," while "[o]thers may have added classroom capacity with local funds that would decrease the amount of unhoused pupils in the district, thus reducing the need for new classrooms."

The Office also explained that due to the length of time that new construction projects had been on the Applications Received List, "some of the projects may have been completed and occupied" during the unfunded period. If the date of submittal to the Applications Received List was not used for these projects, they could be ineligible for the Program as a new construction project that is occupied prior to the date of receipt of the application is ineligible for funding. In addition, some new construction projects may have been eligible when the applications were submitted to the Applications Received List, but if the most current 2016/2017 eligibility were used, the project that was built may qualify for a lesser amount, or possibly, no funding. The Office advised the Board it may wish to consider whether these projects should continue to access Program funds, noting that districts acknowledged bond authority was not guaranteed and because bond authority is limited, "districts that moved forward using local funds do not need matching funds from the state."

Given these considerations, the Office presented the Board with three options. In the first option, the Board would move the applications from the Applications Received List and Approved Applications received on or after April 1, 2017, to the standard Office

10.

workload list, process the applications funding order prescribed in Regulations 1859.93 and 1859.93.1, based on regulations in place at the time of submittal, and require school districts requesting new construction funding to submit new construction eligibility updates for the enrollment year in which the Office processes the application. The Office asserted this would "ensure that bond funds are provided only to projects for which there is a need for additional classrooms or schools," and "that bond funds are spent appropriately," and while some districts may not qualify, or may qualify for fewer pupil grants, those districts may have already built their facilities with local funds. The Office advised that because districts are not typically asked to re-justify eligibility after a school is built, a regulation change might be required as the Office may not be able to process future applications in the same year in which eligibility is considered current.

Under option two, the Board would process the applications in the order received and base the districts' eligibility on their enrollment projects as of the date the applications were submitted. The Office noted this option was consistent with past practice on handling unfunded lists but it may result in "funding new construction projects for which eligibility, if based on a current enrollment projection, does not exist." Under the third option, the Board would return all applications to the districts and require resubmission with updated eligibility data.

At the Board's June 5, 2017 meeting, the Board voted in favor of the first option, requiring school districts with projects on the Applications Received List to submit "new construction eligibility updates for the enrollment year in which the application is processed by the [Office] to justify new construction funding" and directing the Office to begin processing those applications (the resubmission policy). The Board permitted school districts to address the Board "on a case-by-case basis" if the Office determined "a project is deemed ineligible or eligible for less funding than originally requested due to updated eligibility information," by appealing to the Board.

11.

The Office provided information to the Board for its June 28, 2017 meeting on how the Office would process applications on the Applications Received List pursuant to the Board's action on June 5, 2017. With respect to eligibility applications for new construction projects, the Office stated it would require districts to submit a Form SAB 50-01 for the enrollment year the Office begins processing the application, with eligibility applications that relate to a funding application processed at the same time and stand-alone eligibility applications processed as workload permits.

For small school districts, the Office explained that no projects were currently under the three-year eligibility lock since eligibility had not been processed since 2012. The Office stated it would process new construction eligibility for small school districts beginning with eligibility applications for the 2016/2017 enrollment year and once approved by the Board, the district's eligibility would be locked for three years, with funding applications processed during the lock period able to use this eligibility. Since the Office could not guarantee a funding application would be processed within the lock period, however, the district would be required to update its eligibility at the time the funding application was processed if that occurred after the lock period expired. A school district could start a new lock period by submitting new construction eligibility updates before the three years expired.

In April 2018, the Office of Administrative Law approved a Board-submitted amendment to Regulation 1859.51,[9] which reflected the policy requiring school districts to update their new construction eligibility for the enrollment year in which the Office processes the application. As amended, Regulation 1859.51, subdivision (e) provides that "[f]or all funding requests received by OPSC on or after June 6, 2017, OPSC will notify the School District in writing that OPSC is scheduled to begin processing the School

---

[9] Regulation 1859.51 lists the adjustments to "baseline eligibility for new construction determined on the Form SAB 50-03."

12.

District's Form SAB 50-04 and that the School District shall submit the Form SAB 50-01 based on school district enrollment data" for either the prior or current fiscal year depending on when in the year Form SAB 50-01 is received.

Regulation 1859.51, subdivision (j), which applies to small school districts, also was amended. As amended, Regulation 1859.51, subdivision (j)(1) provides that for small school districts, baseline eligibility would be "[d]ecreased by any reduction in projected enrollment that follows a three-year period after the district's eligibility was approved by the Board," and either (A) increased or decreased by changes in projected enrollment in the 2016-2017 enrollment year if the Office received Form SAB 50-01 by October 31, 2017, or (B) "[i]ncreased/decreased by changes in projected enrollment in subsequent enrollment reporting years following 2016/2017 using a fifth-year projection or a tenth-year projection." Regulation 1859.51, subdivision (j)(2) provides that the requirements of Regulation 1859.51, subdivision (e) shall apply if the small school district does not submit an adjustment under Regulations 1859.5, subdivision (j)(1)(A) or (B) before the Office notifies the district of its schedule to begin processing a new construction funding request that was received on or after November 1, 2012.

***Pioneer's 2016 New Construction Application is Processed***

In June 2019, the Office notified Pioneer that it was beginning to process its October 2016 application and requested Pioneer to update its new construction eligibility based on its 2018/2019 enrollment data. Pioneer submitted the updated eligibility, but due to declining enrollment, its eligibility decreased from a total of 260 pupil grants to 13 special day class non-severe pupil grants, which meant it would receive approximately $3 million less in new construction state funding than if the 2013/2014 enrollment data were used. The Board approved the project and the 2018/2019 enrollment adjustment at an October 2019 board meeting.

Pioneer objected to the use of its 2018 enrollment projection in lieu of the 2013 projection and filed an appeal with the Board requesting the application be processed

13.

using the 2013 eligibility.  In a submission to the Board concerning Pioneer's appeal, the Office noted that "[f]rom 2006/2007 to 2018/2019, [Pioneer]'s K-6 grade level projected enrollment was on an overall decline which resulted in a decrease in projected need from 579 to -25 K-6 pupils."  The Office explained that "[i]f the eligibility application submitted for the 2013/2014 enrollment year had been processed at the time it was received in October 2014, [Pioneer] would have had sufficient eligibility to support the pupil grants requested on the full funding application due to the 'three-year lock' afforded Small School Districts."  Since 2013/2014, however, Pioneer's K-6 and special day class non-severe grade level enrollment had decreased which, when coupled with Pioneer's existing school facilities capacity, resulted in less new construction eligibility.

The Office did not support permitting Pioneer to use the new construction eligibility it may have had in 2013/2014, as doing so would not comply with the Board's action requiring districts to demonstrate a current capacity need and it would represent an unfair funding advantage to Pioneer that was "not extended to other districts experiencing similar current eligibility circumstances."  The Office further noted that Pioneer continued with the project as originally designed even though the Board decided in June 2017 to verify eligibility at the time of processing the applications.

At the Board's September 30, 2020 meeting, the Board did not make a motion to approve Pioneer's appeal request.  Therefore, in accordance with the Board's rules and procedures, the Office's administrative action would stand, and the appeal was considered closed.

### *Procedural Background*

Pioneer filed a combined petition for writ of mandate and complaint for declaratory relief in February 2022.  In the petition, Pioneer alleged respondents violated section 17071.75, subdivision (a)(2), by requiring Pioneer to update its new construction eligibility for the enrollment year in which the Office processed the application rather than the enrollment year in which Pioneer submitted the new construction application.

14.

Pioneer asserted respondents' decision not to grant its appeal was an abuse of discretion because: (1) their decision to deny the appeal based on "a regulation that requires a school district to update its new construction eligibility for the enrollment year in which OPSC processes the application" was contrary to the Act; and (2) they failed to proceed in a manner required by law because they promulgated the new regulation requiring updated new construction eligibility in 2018 when Proposition 51 required the funds to be apportioned as the Act read on January 1, 2015. Pioneer asserted it therefore was entitled to a writ of mandate "directing and commanding [respondents] to perform their mandatory duty as set forth" in the petition. Pioneer sought a declaratory judgment on essentially the same grounds, alleging respondents improperly relied on an invalid regulation that was contrary to the Act.

Pioneer filed a motion for issuance of a writ of mandate in September 2022. Pioneer argued respondents improperly required it to update the new construction eligibility because Regulation 1859.51, subdivision (e), requiring a school district to provide updated new construction eligibility, is contrary to the Act and does not apply to Pioneer since it submitted its application before June 6, 2017. Pioneer also argued the Board abused its discretion in approving the resubmission policy because the regulation is inconsistent with the enabling statute.

In opposition, respondents argued Regulation 1859.51 was a valid exercise of the Board's regulatory authority, as the regulation was consistent with, and reasonably necessary to implement, the Act. Respondents further argued its actions were consistent with the resubmission policy.

A hearing on the motion was held on October 12, 2022. After argument, the trial court took the matter under submission and subsequently issued an order requesting additional briefing which directed respondents to file a supplemental brief addressing the court's questions, with Pioneer filing a response and a reply.

In their supplemental briefing, respondents clarified that their request for updated new construction eligibility was not based on Regulation 1859.51, as Pioneer's application was not subject to the current version of the regulation, but rather was based on the resubmission policy the Board adopted on June 5, 2017. Respondents asserted that regardless of the resubmission policy or Regulation 1859.51, neither inflicted the purported harm Pioneer claims because a school district's eligibility for funding does not constitute entitlement to funding, as the Board does not have a ministerial duty to mechanically apply the district's eligibility and then apportion funding accordingly.

Respondents explained that Pioneer's October 2016 application was not immediately determined to be eligible for funding or placed on an eligibility list. Instead, the Office verified the application for completeness and placed it on the Applications Received List as an approved application. Respondents further explained that the small school district lock, which Pioneer was relying on, only applies after the Board approves a school district's eligibility, and the Board did not approve any eligibility applications during the Applications Received List period. Since the Board never approved Pioneer's 2014 eligibility update, Pioneer was not entitled to the eligibility lock for purposes of its 2016 application.

In its supplemental brief, Pioneer contended the resubmission policy is an unenforceable underground regulation under *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 (*Tidewater*), as the policy applied to all new construction applications, not just Pioneer, and the eligibility update was required to justify new construction funding. Pioneer also contended the Board's failure to process its new construction eligibility in 2014 was an abuse of discretion, as respondents did not cite to any statute or regulation that would allow them to wait years to process Pioneer's eligibility.

A further hearing was held on January 24, 2023. The trial court announced its tentative decision to deny the petition for writ of mandate, which it adopted after hearing

16.

argument from the parties. That same day, the trial court issued its written order denying the petition for writ of mandate. The trial court found there is a distinction between the Office's "approval of the application for school funding due to its completeness" and the Board's "allocati[on] of funding for school construction." The trial court found the Board had "persuasively established it had discretion to adopt a policy to require additional student enrollment data before allocating funding for school construction due to the multiyear period of time there were no funds available for distribution i.e.[,] allegedly from 2012 to November 2016." Therefore, "[i]t was reasonable for the Board to require updated student enrollment data before allocating construction funding."

The trial court also found the Board established the three-year lock for small school districts requires Board approval of eligibility. Because applications were not presented to the Board during the period when no funds were available, "no small school district was in the three[-]year eligibility lock at the time the policy for processing the applications on the" Applications Received List was created. Therefore, "it was reasonable for the Board to require updated student enrollment data for all school districts on the [Applications Received List] commencing with the 2016/2017 time period."

The trial court determined the resubmission policy, which addressed how school district applications on the Applications Received List would be processed, was not an underground regulation under *Tidewater*. Even if it could be considered such, Pioneer had not "established prejudice from being required to update the student data, since at all times the Board had discretion on how the funds were to be allocated." In sum, the trial court found the resubmission policy was not contrary to the Education Code or that Pioneer demonstrated a prejudicial abuse of discretion, and denied the petition for writ of mandate.

Respondents served notice of entry of the order on January 26, 2023. On February 14, 2023, a judgment was filed which stated the trial court entered an order denying the petition for writ of mandate on January 24, 2023, which was attached to the

judgment, and for the reasons stated in the order, (1) judgment was entered in respondents' favor as to the petition for writ of mandate, and (2) because denial of the petition disposed of all issues in the action and resolved allegations essential to all of the claims, Pioneer's accompanying complaint for declaratory relief was dismissed. Respondents served notice of entry of the judgment on March 1, 2023.  Pioneer filed a notice of appeal of the February 14, 2023 "Judgment after denial of Writ of Mandate" on April 3, 2023.

## **DISCUSSION**

Pioneer contends the trial court erred in denying the petition for writ of mandate because the Board had a statutory duty to process the 2016 funding application using the 2013/2014 enrollment projection.  Pioneer argues the resubmission policy used to process its 2016 funding application is invalid as an underground regulation and the Board abused its discretion when it failed to process its eligibility in 2014.

## I.    The Motion to Dismiss

Before proceeding, we briefly address respondents' motion to dismiss the appeal. Respondents assert we must dismiss the appeal as untimely because, although Pioneer filed its notice of appeal within 60 days of notice of entry of the judgment, the notice of appeal was not filed within 60 days of notice of entry of the trial court's January 24, 2023 order, which respondents assert is the appealable order.  In support, respondents rely on *Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, 58, review granted on June 15, 2022, S274147, on the issue of dismissal of untimely appeal.

We note that this court denied a similar motion to dismiss in *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 368, footnote 2, as the appeal was filed within 60 days after entry of the judgment, which we stated was appealable.  The appellate court in *Meinhardt v. City of Sunnyvale*, however, declined to follow the ruling in this footnote.  (*Meinhardt v. City of Sunnyvale*, *supra*, 76 Cal.App.5th at pp. 67–68.) Rather than address this dispute further, we elect to treat the issue as the appellate court

18.

did in *Pacific Palisades Residents Assn., Inc. v. City of Los Angeles* (2023) 88 Cal.App.5th 1338, 1356:  "Because our Supreme Court granted review of *Meinhardt* and because our analysis shows the respondents indeed do win on the merits, we will assume without deciding that *Meinhardt* was wrongly decided.  Whether our assumption is right or wrong, the respondents defeat this appeal and the trial court's judgment stands. This issue thus does not matter here and will detain us no further."  Accordingly, we deny the motion to dismiss the appeal.

## II.     The Standard of Review

Pioneer is seeking a writ of mandate under Code of Civil Procedure section 1085. "A writ of mandate lies under Code of Civil Procedure section 1085 ' "to compel the performance of a legal duty imposed on a government official" ' or 'a public body.' [Citations.]  'To obtain relief under Code of Civil Procedure section 1085, " 'the petitioner must show there is no other plain, speedy, and adequate remedy; the respondent has a clear, present, and ministerial duty to act in a particular way; and the petitioner has a clear, present and beneficial right to performance of that duty.  [Citation.]  A ministerial duty is one that is required to be performed in a prescribed manner under the mandate of legal authority without the exercise of discretion or judgment.' " ' " (*Public Employment Relations Bd. v. Bellflower Unified School Dist.* (2018) 29 Cal.App.5th 927, 939.)

" 'In reviewing a judgment granting or denying a writ of mandate petition, " 'we apply the substantial evidence standard of review to the court's factual findings ….' " ' [Citation.]  Factual findings are examined for substantial evidence and any conflicts in the evidence are resolved in favor of the prevailing party.  [Citation.]  However, '[o]n questions of law, including statutory interpretation, the appellate court applies a de novo review and makes its own independent determination.' " (*Public Employment Relations Bd. v. Bellflower Unified School Dist.*, *supra*, 29 Cal.App.5th at p. 939.)

19.

## III.    Analysis

The question before us is whether the Board had ministerial duties to process Pioneer's eligibility in 2014 and to use that eligibility when processing Pioneer's 2016 funding application in 2019.

### A.    *No Duty to Process Pioneer's 2014 Eligibility Application*

During the period from November 2012 to November 2016 when the Board had insufficient bond authority, Regulation 1859.95.1, subdivision (a)(1) required the Office to receive and determine if a school district's funding request on Form SAB 50-04 was an "Approved Application," meaning the district submitted the application and all required documents.  If the funding request was accompanied by a school board resolution, as specified in Regulation 1859.95.1, subdivision (b), the Office was then required to place the Approved Application on the Applications Received List without determining if the Approved Application was "Ready for Apportionment."  (2 C.C.R., §§ 1859.95.1, subd. (a), 1859.2.)

While subdivisions (a) and (b) of Regulation 1859.95.1 govern the processing of Form SAB 50-04 funding applications, subsection (c) governs the processing of eligibility applications.  That subsection provides that the Office will "receive and determine if the Forms SAB 50-01, 50-02, and 50-03" (which are the forms that comprise the eligibility application) "are Approved Applications," but the Office "will not determine if the Approved Application is Ready for Apportionment."  (2 C.C.R., § 1859.95.1, subd. (c).)

In accordance with Regulation 1859.95.1, subdivision (c), the Office did not process any eligibility applications during the unfunded period.  Rather, it reviewed the eligibility applications to determine if they were complete but did not determine whether those applications met all requirements of law for an "eligibility determination" or recommend approval to the Board.  (2 C.C.R., §§ 1859.95.1, subd. (c), 1859.2 [defining " 'Ready for Apportionment' " as the Office completing a "final review of an Approved

20.

Application," determining "it meets all requirements of law for an apportionment *or eligibility determination*," and recommending approval to the Board (italics added)].)

Thus, when the Office received Pioneer's eligibility application in 2014, it reviewed the application to determine if it was complete but did not recommend approval to the Board and the Board did not act on the application. Because the Board did not approve Pioneer's eligibility, the new construction eligibility projections based on the 2013/2014 enrollment year were not locked in for purposes of ongoing eligibility. (§ 17071.75, subd. (g) [a small school district cannot lose ongoing eligibility for three years "from the date of the approval of eligibility by the board"].)

While Pioneer complains that the trial court's ruling does not cite to any statute or regulation that would allow respondents not to process Pioneer's 2014 new construction eligibility application, Regulation 1859.95.1, subdivision (c) provides such authority. Pioneer asserts respondents were required to process the application because Regulation 1895.95.1, subdivision (c) only prohibits the Office from determining the application "is Ready for Apportionment," and Pioneer did not seek funding or apportionment when it submitted its eligibility application. But the term "Ready for Apportionment" applies equally to eligibility applications, as it means the Office has determined the "Approved Application" meets all requirements of law for an eligibility determination. (2 C.C.R., § 1859.2.) Since the regulation authorizes respondents not to process eligibility applications, they did not have a ministerial duty to process Pioneer's eligibility application in 2014 or abuse their discretion not doing so. (*Galzinski v. Somers* (2016) 2 Cal.App.5th 1164, 1170 [" '[a] duty is ministerial when it is the doing of a thing unqualifiedly required' "].)

## B.     *The Resubmission Policy*

Since Pioneer's new construction eligibility based on the 2013/2014 enrollment data was not processed and the Board did not approve the eligibility application, Pioneer's new construction eligibility was not locked in when it filed the funding

21.

application in 2016 or when respondents processed the funding application in 2019. This was the issue the Office was presented with once bond funding was restored in November 2016—how to address eligibility for new construction funding for the backlog of applications on the Applications Received List. The Board ultimately adopted the policy that required school districts to resubmit new construction eligibility projections when the funding applications were processed and allowed small school districts to lock in eligibility based on 2016/2017 enrollment data.

Based on the resubmission policy, respondents required Pioneer to provide updated eligibility projections as of the date the funding application was processed since Pioneer did not lock in any other projection. Pioneer challenges the resubmission policy, arguing: (1) the policy is inconsistent with the Act, which requires eligibility to be processed as of the date the application was submitted; and (2) is invalid as an underground regulation.

### 1.      The Resubmission Policy is Consistent with the Act

On the first point, Pioneer argues the resubmission policy is inconsistent with the Act because section 17071.75, subdivision (a) required respondents to process eligibility as of the date of application. Pioneer asserts that section 17071.75 clearly states "[a] school district shall calculate enrollment projections for the fifth year beyond the fiscal year in which the application is made" and "may submit an enrollment projection for either a 5th year or a 10th year beyond the fiscal year in which the application is made." (§ 17071.75, subd. (a)(2) & (a)(3)(A).) Therefore, Pioneer reasons, the Board had a duty to process Pioneer's funding application based on the eligibility Pioneer established when its funding application was submitted in 2016.

To determine whether section 17071.75 creates a ministerial duty, we must begin with the statute's intent. (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 701.) We do so using the typical rules of statutory interpretation: " 'We begin by examining the statutory language, giving the

22.

words their usual and ordinary meaning.' [Citations.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911.)

The plain language of section 17071.75, subdivision (a) requires the school district to provide eligibility projections beyond the fiscal year in which the application is made. These projections, however, may be adjusted. The calculated eligibility on the Form SAB 50-03 is the school district's "initial eligibility," which is referenced as the "baseline eligibility for future [Program] funding" and serves as the basis for filing the Form SAB 50-04 funding application. (2 C.C.R., § 1859.50.) The baseline eligibility is not static, as it "will be adjusted" as provided in Regulation 1859.51, including for changes in projected enrollment. (2 C.C.R., § 1859.51, subds. (e) & (j).)

The version of Regulation 1859.51 in effect when Pioneer submitted its funding application in 2016, which the parties agree applies to Pioneer's application, provided a small school district's baseline eligibility could be increased by changes in projected enrollment in subsequent enrollment reporting years and decreased "[b]y any reduction in projected enrollment that follows a three-year period after the district's eligibility was approved by the Board." (2 C.C.R., former § 1859.51, subd. (j).) Neither section 17071.75 nor these regulations, however, contemplated a multi-year delay between submission of eligibility and funding applications and apportionment, much less address how the Board must process such applications given the delay. That delay, of course, was caused by the lack of available bond authority and funds, and was exacerbated by the backlog of applications on the Applications Received List. Thus, the resubmission policy was not inconsistent with the Act, since the Act did not address the situation the Board was presented with here.

Further, we agree with respondents that section 17071.75 does not impose a duty on the Board to *allocate* funds strictly in accordance with the eligibility projections, as the Board uses those projections to determine a school district's "*maximum* total new

23.

construction grant eligibility" by multiplying the district's calculated number of unhoused pupils by specified per-unhoused-pupil grant amounts, adjusted by inflation. (§ 17072.10, subds. (a) & (b).)[10]  In this process, the Board determines school districts' eligibility to receive apportionments and then apportions funds to eligible districts. (§ 17070.35.)  While the Act requires the Board to use a district's enrollment projection to determine a *ceiling* for an allocation amount, it does not require the Board to allocate that amount.

Pioneer asserts the Board did not have discretion to request updated eligibility projections because the Board may only "verify and adjust, as necessary, and approve" Pioneer's request for project apportionment based on Pioneer's calculation of eligibility.[11]  (§ 17072.20, subd. (c).)  Pioneer contends this creates a ministerial duty to

---

[10]     Section 17072.10, subdivision (a) provides:  "(a) The board shall determine the maximum total new construction grant eligibility of an applicant by multiplying the number of unhoused pupils calculated pursuant to Article 3 (commencing with Section 17071.75) in each school district with an approved application for new construction, by the per-unhoused-pupil grant as follows:  [¶] (1) Five thousand two hundred dollars ($5,200) for elementary school pupils.  [¶] (2) Five thousand five hundred dollars ($5,500) for middle school pupils.  [¶] (3) Seven thousand two hundred dollars ($7,200) for high school pupils."

Section 17072.10, subdivision (b) provides:  "(b) The board annually shall adjust the per-unhoused-pupil apportionment to reflect construction cost changes, as set forth in the statewide cost index for class B construction as determined by the board."

[11]     Section 17072.20 provides:

"(a)  An applicant school district that has been determined by the board to meet the eligibility requirements for new construction funding set forth in Article 2 (commencing with Section 17071.10) or Article 3 (commencing with Section 17071.75) may submit at any time a request to the board for a project apportionment for all or a portion of the funding for which the school district is eligible.

"(b)  The application shall include, but shall not be limited to, the school district's determination of the amount of state funding that the district is otherwise eligible for relating to site acquisition, site development, new construction, and hardship funding provided pursuant to Article 8 (commencing with Section 17075.10), if any.  The amount shall be reduced by the amount of the alternative fee collected pursuant to subdivision (a)

24.

use Pioneer's eligibility projection. Section 17072.20 and Regulation 1859.51, however, allow for adjustments to Pioneer's eligibility calculation for changes in projected enrollment, but neither contemplates how such adjustments should occur when eligibility applications have not been processed for many years.

Pioneer does not take issue with Regulation 1859.95.1, which instructed the Office not to process or submit for approval applications for eligibility and funding during the unfunded period. If the Board truly had no discretion over this process, the decision not to process eligibility and funding applications, which was permitted under the Board's regulations, must surely fall by the wayside. Indeed, one may wonder why the Board is needed if the procedure for apportioning bond funding were purely ministerial. Surely the Office's employees, with their expertise, could process and approve eligibility and funding applications. We disagree this is what the Legislature intended.

It is true, as Pioneer asserts, that construction bond funds have been exhausted in the past. But, in prior unfunded periods, applications for eligibility and funding were processed and approved, with the approved projects placed on a list to await funding. (2 C.C.R., § 1859.95.) During the present unfunded period, however, eligibility and funding applications were not processed or approved; instead, they were placed on a list to await the receipt of bond authority. (2 C.C.R., § 1859.95.1.) This placed the Board in a quandary once it received bond authority, namely, how to process eligibility and funding applications given the four-year unfunded period and the backlog of applications that needed processing. As we have explained, the Board had discretion on how to handle this unique situation. While Pioneer asserts the Board was required to apportion funds as the Act read on January 1, 2015, the Act did not address the situation the Board

---

of Section 65995.7 of the Government Code if a reimbursement election or agreement pursuant to Section 65995.7 of the Government Code is not in effect.

"(c) The board shall verify and adjust, as necessary, and approve the district's application."

was presented with.  Therefore, the Board acted within its discretion in implementing the resubmission policy.

### 2.      The Resubmission Policy is not an Underground Regulation

Pioneer contends the resubmission policy is an underground regulation because it was not adopted pursuant to the rulemaking procedures of the Administrative Procedure Act (APA; Gov. Code, § 11340 et seq.).

The APA establishes procedures for the adoption of regulations by state agencies. (*Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 503–504 (*Pacific Gas & Electric*).)  A "regulation" is defined as a rule, order or standard of general application adopted by a state agency to implement, interpret, or make specific the law it enforces or administers, or to govern its procedures.  (Gov. Code, § 11342.600; *Tidewater*, *supra*, 14 Cal.4th at p. 571.)  Generally, state agencies must adopt regulations following the procedures established in the APA.  These procedures, among other things, require state agencies to provide the public with notice of proposed regulations (Gov. Code, §§ 11346.4, 11346.5), give interested parties an opportunity to comment on proposed regulations (*id.*, § 11346.8), and respond in writing to submitted written comments (*id.*, §§ 11346.8, 11346.9).  Regulations wrongly adopted outside these procedures are known as "underground regulations" and are void.  (See Cal. Code Regs., tit. 1, § 250, subd. (a); *Tidewater*, at pp. 572–573.)  Where, as here, there are no factual disputes, we apply the de novo standard of review on whether an agency's policy constitutes an underground regulation.  (*Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 435–436.)

A regulation under the APA has two principal identifying characteristics:  (1) "the agency must intend its rule to apply generally, rather than in a specific case," and while the rule need not apply universally, it "applies generally so long as it declares how a certain class of cases will be decided"; and (2) "the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or … govern [the

agency's] procedure.' " (*Tidewater, supra*, 14 Cal.4th at p. 571.)  Pioneer argues the resubmission policy satisfies both characteristics:  (1) it applies generally because it applies to all new construction applications; and (2) the policy was implemented to govern the Board's procedures in apportioning school construction funds.  Respondents counter that the resubmission policy does not satisfy the first characteristic, as it does not bear on future cases, but rather applies solely to the identified and closed number of new construction applications that were on the Applications Received List.

The *Pacific Gas & Electric* case is instructive on this issue.  There, the utility, which purchased power from the California Department of Water Resources (department) filed a petition for writ of mandate challenging the way the department carried out emergency legislation authorizing the buying and selling of electrical power during a statewide energy crisis.  (*Pacific Gas & Electric, supra*, 112 Cal.App.4th at p. 480.)  The legislation authorized the department "to recover its costs by submitting a 'revenue requirement' to the California Public Utilities Commission … for incorporation into utility rates."  (*Ibid.*)  The trial court determined the department was required to conduct a review to determine whether the costs to be included in the revenue requirement were just and reasonable pursuant to the APA's procedures.  Since the department failed to follow APA procedures, the trial court granted the writ petition.  (*Pacific Gas & Electric*, at pp. 480–481.)

The appellate court concluded the revenue requirement did not constitute a regulation under the APA, as it did not create a standard of general application.  (*Pacific Gas & Electric, supra*, 112 Cal.App.4th at pp. 503, 505–507.)  The court determined the revenue requirement was an accounting exercise to calculate the amount of the department's reimbursable costs for a finite period, and while it involved a large sum, it concerned a discrete project, namely, emergency power purchases, and its determination constituted compliance with the statutory mandate rather than an attempt to interpret the statutes.  (*Id.* at pp. 505–506.)  Moreover, because all long-term contracts had been in

place since 2001, the department was statutorily precluded from entering into any new power contracts, and "there was no 'open class' of future power purchase programs or long-term contracts."  (*Id.* at p. 506.)

Also instructive is *Faulkner v. California Toll Bridge Authority* (1953) 40 Cal.2d 317, which held resolutions of the California Toll Bridge Authority approving a Department of Public Works recommendation to construct the Richmond–San Rafael Bridge and authorizing issuance of toll bridge revenue bonds did not constitute regulations under the APA.  (*Id.* at pp. 322–323.)  Our Supreme Court concluded the resolutions were not of general application adopted to implement or interpret the law, but rather were adopted for a particular application concerning whether to approve the recommendation to construct the bridge and authorize the issuance of revenue bonds. (*Id.* at p. 323.)  The court rejected an argument that the resolutions were of general application because the tolls to be collected on the bridge affected the public generally and the bonds may be purchased by anyone in the world, as the application related to only one bridge and to the specific project described.  (*Id.* at p. 323.)  The court noted the resolutions did not purport to generally treat "all bridges or all toll bridges or any open class under the jurisdiction of the authority," and they "constituted steps in the performance of a statutory duty, rather than acts which would 'implement, interpret, or make specific the law.' "  (*Id.* at pp. 323–324.)

In our view, the resubmission policy did not constitute a regulation under the APA, as it did not create a standard of general application.  The Board did not intend the resubmission policy to apply generally; rather, it intended the policy to apply to the discrete and finite set of funding applications that were on the Applications Received List prior to June 6, 2017.  The policy did not apply to an open class of future applications and did not "function[], in both intent and practice, as a rule that must be followed prospectively" in agency proceedings.  (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 556.)  Rather, the policy was adopted for a specific project and

application, namely, processing the backlog of funding applications that were on the Applications Received List.

In sum, the resubmission policy is not an underground regulation and does not conflict with the Act, the Board acted well within its discretion in enacting the policy and applying it to Pioneer. Since Pioneer has not shown that the Board had a mandatory duty to use the 2013/2014 enrollment projections, the trial court did not err in denying Pioneer's petition for a writ of mandate.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.


                                        DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


MEEHAN, J.